## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ELIZABETH WILLIAMS,

*Plaintiff*,

v.

TOWNSHIP OF LAKEWOOD, *et al*.,

*Defendants*.

Civil Action No.: 17-cv-11401 (PGS)(TJB)

**MEMORANDUM
AND ORDER**

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on motions for summary judgment filed by

Defendants Township of Lakewood ("Lakewood"), Gregory Meyer ("Meyer"), Thomas

Henshaw ("Henshaw"), and Robert DeSimone ("DeSimone") (collectively, "Defendants").

(ECF Nos. 24, 26). In the present motions, Defendants seek summary judgment on Elizabeth

Williams's ("Plaintiff" or "Williams") twenty-five count Complaint, (ECF No. 1), in its entirety.

(*See generally* ECF Nos. 24, 26). For the reasons stated herein, Defendant's motions are granted

in part and denied in part.

### BACKGROUND

Plaintiff is a sixty-three-year-old Latin-American female of Dominican heritage and a

resident of Lakewood, New Jersey. (Pl. Statement of Uncontested Material Facts Opp. Def. Mot.

for Summ. J. ("PUMF") ¶ 1, ECF No. 27; Compl. ¶ 5, ECF No. 1).[1] On May 6, 2002, Plaintiff

commenced employment with Lakewood within the Lakewood Township Police Department

("LTPD") as a Clerk/Typist. (*See* Def. DeSimone's Statement of Undisputed Material Facts

("DDUMF") ¶ 1, ECF No. 26-21; Defendants' Statement of Undisputed Material Facts

---

[1] References to statements of material facts are undisputed, unless otherwise noted.

("DUMF") ¶ 1, ECF No. 24-1; Compl. ¶ 5).  Plaintiff was forty-four years old when she was hired by LTPD.  (DDUMF ¶ 2).  On or about March 8, 2017, her employment with LTPD came to an end under allegedly unlawful circumstances.  (*See* Compl. ¶ 5).  In this action, Plaintiff alleges she was subjected to age, sex, and racial discrimination; retaliation; and a hostile work environment.  She also alleges that LTPD's policies and practices created a racially disparate impact on Latina employees.

Plaintiff is suing Lakewood and individual defendants Henshaw, Meyer, and DeSimone. Henshaw, Meyer, and DeSimone were employed by the LTPD at different times.  (PUMF ¶ 4). Meyer has been the Chief of Police since August 1, 2016; Henshaw was the former Lakewood Township Manager from February 2015 to September 2018; and DeSimone was a sergeant on the force until his departure from the LTPD in December 2017.[2]  (*Id*.; DDUMF ¶¶ 17, 46, 47).

In May 2002, Plaintiff began her employment with the LTPD as a secretary to then-Captain Robert Lawson.  (DDUMF ¶ 3; *see also* PUMF ¶ 7).  On or about April 26, 2006, Plaintiff received a written reprimand from Public Safety Director Al Peters.  (*Id*. ¶ 4; *see* Certification of Counsel ("Jones Cert."), Ex. E, 26-7).  The documentary evidence submitted by Defendants does not clearly indicate why Plaintiff was reprimanded.  (*See id*.).  After the written reprimand was issued, however, Director Peters moved Plaintiff from her position as Lawson's secretary in Administration to what Plaintiff claims was a less desirable position in the Records Department (also known as the "Records Room" or "Records").  (*See id*. ¶ 5; DUMF ¶ 3). Plaintiff contends that Director Peters moved her to Records "as a form of punishment."  (PUMF ¶ 21 (disputed)).  At oral argument, Plaintiff clarified that her salary did not change as a result of

---

[2] DeSimone has retained separate counsel and has moved for summary judgment by separate motion from Lakewood, Henshaw, and Meyer.  (ECF No. 26).

the transfer.  In December 2006, after Lawson was promoted to Chief of Police, Lawson restored Plaintiff's position in Administration as his secretary.  (DUMF ¶ 4).

Plaintiff and Lawson were friends at all times relevant to this suit.  (*Id*. ¶ 5; DDUMF ¶ 8). Lawson co-signed the mortgage on two of Plaintiff's homes, and remains a co-owner and co-signee on the mortgage on the home in which Plaintiff presently resides.  (DDUMF ¶ 9; *see also* DUMF ¶ 6).  After Lawson retired, Plaintiff was reassigned to the Records Room.[3]  Lawson stayed in touch with Plaintiff because he believed "there was an atmosphere within the police department and not only the police department, but finance and the manager's office that people didn't like her."  (DUMF ¶ 11; Certification of Counsel Support Mot. for Summ. J. ("Riordan Cert."), Ex. C, Deposition of Robert Lawson ("Lawson Dep.") at 71:4-25, ECF No. 24-7). Lawson also testified at deposition that:

> [T]he union president called [Plaintiff] incompetent because she couldn't pass the typing test.  And this sort of pervaded.  It was a lot of jealousy within the police department towards [Plaintiff] because of her, because of her salary, because of her office, because of her position.  You know they felt that somebody more senior or more experienced should have it.

(*Id*.).  Plaintiff explained at oral argument that she was required to pass the typing test in order to receive a promotion – not in order to be deemed qualified for the position she maintained at that time.

Defendants cite numerous instances throughout Plaintiff's employment in which she made mistakes or inadequately performed her duties.  Beginning on October 29, 2014, then-Interim Municipal Manager Steven Reinman issued a memorandum suspending Plaintiff for two days after she made "a series of extra duty billing errors that have been time consuming and costly to repair."  (DDUMF ¶ 10; DUMF ¶ 7; Riordan Cert. Ex. E, ECF No. 24-9).  According to

---

[3] The parties disagree as to precisely when that reassignment occurred.  (*See* DDUMF ¶ 27, DUMF ¶ 12).

Reinman's memorandum, Plaintiff also "mishandled" checks.  (Riordan Cert. Ex. E).  Similarly, on February 23, 2016, Plaintiff received a written reprimand from Defendant Henshaw, then-Municipal Manager, which indicated that Plaintiff "delayed the deposit of $126,000.00 pertaining to outside duty."  (Riordan Cert. Ex. G, ECF No. 24-11).  In September 2016, after Plaintiff was transferred from her role in Administration to the Records Room, DeSimone and another officer were cleaning out her office when they found a folder containing eighteen uncashed checks from 2013 and 2014 that were payable to Lakewood, totaling more than $37,000.  (Riordan Cert. Ex. H, ECF No. 24-12; Ex. L, ECF No. 24-16.)

Meanwhile, beginning in January 2016, Henshaw allegedly instructed administrative supervisors to begin covertly monitoring Plaintiff's work performance.  (*See* DUMF ¶ 23 (disputed); DDUMF ¶ 20 (disputed)).  Defendants contend that Internal Affairs commenced an official "administrative investigation" into Plaintiff's work performance in October 2016, and Plaintiff was notified of that investigation on October 21, 2016.  (*See* DDUMF ¶ 35 (disputed); DUMF ¶ 29 (disputed); DeSimone Reply Br. at 7, ECF No. 31).  Apparently, Henshaw had no authority to commence the investigation, (PUMF ¶ 37),[4] and Chief Lawson was not informed about it, (*see* PUMF ¶ 50).[5]  At Henshaw's direction, DeSimone participated in the investigation by keeping a journal of Plaintiff's work performance from January 2016 to August 2016 and sharing it only with Henshaw.  (PUMF ¶ 63, 136; DDUMF ¶ 48).  Henshaw instructed DeSimone not to inform Chief Lawson – his boss – about the log.  (PUMF ¶ 137).

In October 2016, Plaintiff filed a complaint with the U.S. Equal Opportunity Commission ("EEOC"), alleging that Latina employees were segregated in the Records Room, denied

---

[4] Not disputed by DeSimone; disputed by Lakewood, Henshaw, and Meyer.

[5] Not disputed by DeSimone; disputed by Lakewood, Henshaw, and Meyer.

advancement opportunities, and subjected to inferior treatment compared to white women at the LTPD.  (ECF No. 38 Ex. A).  She also claimed that Lakewood deliberately delayed her application for promotion, denied her the training and materials needed to perform her duties, and replaced her with a younger white woman when she was transferred from Administration to Records.  (*Id.*).

In December 2016, Defendants received a Notice of Charge of Discrimination issued by the EEOC.  (Riordan Cert. Ex. Q, ECF No. 24-21).  The notice indicated that Plaintiff had filed a charge under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act for purported discrimination based upon her sex, religion, national origin, and age.  (Jones Cert., Ex. N, ECF No. 26-16).  In August 2017, the EEOC mailed Plaintiff a Dismissal and Notice of Rights.  (ECF No. 38 Ex. D).  It stated that it could not conclude that a violation was established and notified Plaintiff of her right to sue the respondent(s) under federal law within ninety days of receiving the Notice.  (*Id.*).

After completing the investigation into Plaintiff's work performance and interviewing Plaintiff on January 4, 2017, Detective Sergeant Cunliffe issued two memoranda on behalf of the Office of Professional Standards, dated February 1, 2017 and February 9, 2017.  (Riordan Cert. Exs. L, M, ECF Nos. 24-16, 24-17).

In the first memorandum, Cunliffe found that Plaintiff was incompetent and performed her duties with "gross negligence," leading to various issues such as un-deposited checks, failure to pay vendors, late payments to vendors, overpayments to vendors, and numerous duplication of purchase orders.  (*Id*. Ex. L at 1).  For example, "no fewer than" 18 checks were found in Plaintiff's office, all dated between the years 2013 and 2014.  (*Id*. at 2).  Cunliffe concluded those checks totaled "$39,013.69 that vendors had never been charged for off-duty work

completed by township police officers." (*Id*.).  In addition, the memorandum stated that: (1) over the course of 2015 and 2016, Plaintiff either duplicated purchase orders or overpaid vendors no fewer than 81 times; (2) there were 12 instances where Plaintiff either forgot to have purchase orders signed, had conflicting billing accounts, or failed to provide the necessary back-up documents required for purchase orders; and (3) there were no fewer than 6 instances where Plaintiff's late or non-payments caused service disruptions or repossession of items, including with respect to the Township's Ford dealer account that performed all work and maintenance on police vehicles.  (*Id*. at 2-3).  Ultimately, Cunliffe "sustain[ed]" disciplinary charges levied against Plaintiff for "poor performance of duty," "incompetence," and "insubordination," and recommended Plaintiff's termination.  (*Id*. at 3).

In his second memorandum, Cunliffe found that, on numerous occasions, Plaintiff was late, absent without leave from her post, failed to properly request time off (as required by her employment contract and special memorandum issued by Lawson), and improperly submitted overtime requests for dates to be worked in the future.  (*Id*. Ex. M).  Ultimately, Cunliffe "sustain[ed]" the disciplinary charges levied against Plaintiff for "poor performance of duty," "absence without leave," and "insubordination," and recommended that Plaintiff be terminated. (*Id.* at 5).

On March 7, 2017, a hearing was held on the disciplinary charges set forth in Cunliffe's memoranda, (DUMF ¶ 39), and a Final Notice of Disciplinary Action terminating Plaintiff's employment was issued, (Riordan Cert., Ex. R, ECF No. 24-22).  The Final Notice provided a "Schedule" of incidents purportedly giving rise to Plaintiff's discharge, including Plaintiff's: (1) failure to deposit $37,000 in checks from Lakewood Township vendors for police officer "extra duty pay," (*id*., Schedule A ¶¶ 1-2); (2) failure to "recoup" $39,000 for police officer extra duty

work, (*id*. ¶ 3); (3) duplication of payments to Township vendors and "incompetent" handling of purchase orders which cost the Township thousands of dollars, (*id*. ¶¶ 4-6); (4) unaccounted-for lateness or absence from her post, (*id*. ¶ 10); and (5) failure to properly report her time within the Police Officer Scheduling System ("POSS"), (*id*. ¶¶ 11).  On or about March 10, 2017, Plaintiff was served at her home with the Final Notice by multiple uniformed police officers in marked police cars.  (*See* Compl. ¶ 54; Opp Br. at 8, 14, 49, 53; *see also* PUMF ¶¶ 206-210).  Plaintiff alleges that the officers had "their hands on their weapons" as they effectuated service.  (Opp. Br. at 8, 42, ECF No. 27-1).

Plaintiff generally refutes the veracity of the allegations supporting the disciplinary charges that led to her termination. (*See id*. at 10-13).  She contends that the disciplinary charges were unsupported and a pretext to mask the discriminatory treatment of herself and her Latina colleagues.  (*See, e.g., id*. at 13-14, 34-38).  Her forensic data expert pointed to several flaws in LTPD's data preservation systems that undermined the trustworthiness of the records produced by Defendant and suggested that exculpatory evidence may have been withheld.  (Opp. Br. 11-12; PUMF ¶ 57; *see* Certification of Michael Nelson ("Nelson Cert."), Exs. N, O, P, Q, ECF Nos. 30-13, -14, -15, -16).

On November 8, 2017, Plaintiff filed a Complaint against Defendants asserting twenty-five claims under federal and state law.  (ECF No. 1).  Plaintiff's claims fall into three general categories: (1); hostile work environment; (2) race- and sex-based employment discrimination; and (3) retaliation.  (*See* PUMF ¶ 2).  A summary of the facts underlying those claims follows.

First, Plaintiff asserts that she endured a hostile work environment that caused her to suffer emotional and physical injury.  (Opp. Br. at 48-51).  She submits evidence indicating that she felt harassed at work, including an email to Sergeant Peter LaRosa which asserted, *inter alia*,

that: (1) on November 1, 2016, her workplace was tampered with by co-workers; (2) she felt as though she was "not liked" by her peers; (3) she was experiencing "new harassment" from her co-workers "every week"; and (4) her "superiors" were "keeping [Plaintiff] under [a] microscope to the point that is caus[ing] [Plaintiff] chest pain and the stress is making [her] back hurt even more." (Certification of Elizabeth Williams ("Williams Cert."), Ex. A, ECF No. 30-14). In that letter, Plaintiff also suggests that her civil rights were being violated as a result of the unequal treatment she was receiving. (*Id.*). Additionally, in her sworn certification, Plaintiff attests that she reported her coworkers' harassment to the Township Manager on multiple occasions to no avail. (*See, e.g.*, Williams Cert. ¶¶ 17, 18, ECF No. 27-5). Moreover, her certification indicates that in 2005, she suffered heart problems which caused her to remain out of work for four months as a result of the "humiliation and intolerance" she experienced at work. (*Id.* ¶ 23). She also claims that she was deliberately denied medically prescribed accommodations – an ergonomic chair and computer monitor – as well as other necessary tools and training to perform her work. (Opp. Br. at 24-25, ECF No. 27-1).

In addition, Plaintiff testified at deposition that in 2016, DeSimone told her that "when she goes on vacation to her Dominican Republic, they will not let her back into the US," and asked her "[a]re you sure you're a citizen? You sure you got your papers?" (PUMF ¶ 177; Nelson Cert. Ex. C, Deposition of Elizabeth Williams ("Williams Dep.") at 146:8-15, ECF No. 30-2). She also testified that DeSimone told Plaintiff that by the time she returned from her vacation, Lakewood may have hired a "Blonde young female" with "nice boobs." (Williams Dep. at 148:4-23). Lawson testified that he counseled DeSimone on this comment after Plaintiff brought it to his attention and warned him against making similar inappropriate remarks in the future. (Lawson Dep. at 112). Finally, Plaintiff testified that DeSimone asked her "how come

[she] can't find a man" when she went to the Dominican Republic.  (Williams Dep. at 159:20-160).

With respect to racial discrimination, Plaintiff alleges that, as a general practice, Lakewood did not offer Latina employees positions in Administration and instead assigned them to less-desirable positions in Records.  (Opp. Br. at 34-36; Compl. ¶¶ 25-26, 50).  Plaintiff testified at deposition that when she commenced her employment with LTPD in May 2002, she was told by a receptionist that she was the first "minority" to be employed in Administration. (Williams Dep. at 52:10-21, ECF No. 30-3).  However, Plaintiff's position in Administration did not last long, as she was temporarily reassigned to the Records Room by Director Peters in 2006 and was later permanently transferred there after Lawson's retirement.  Upon her final transfer to Records, "[Plaintiff's] position as secretary in Administration was replaced by Leanne Newman and Donna,[6] two white females."  (PUMF ¶ 133) (disputed)).  Plaintiff alleges that those reassignments, as well as a purported pattern and history of Lakewood assigning minorities to Records, "offers the casual connection of [Plaintiff's] disparate treatment as a Latina female." (Opp. Br. at 36).  Lawson opined that Plaintiff's transfer to the Records Room and subsequent termination may have been a form of punishment.  (Lawson Dep. at 25-27, 93).

Plaintiff sets forth a plethora of other purported incidents and circumstances to support her discrimination claim.  (*Id*. at 37).  For example, she testified that at least one other "Spanish girl" working in Records did not receive a raise after working for Lakewood for many years. (*See* Williams Dep. at 24:8-18).  Indeed, Plaintiff stated that her salary remained the same for ten or eleven years, (Williams Dep. at 170:11:20, ECF No. 30-1), and that she was denied an anticipated promotion while white women were promoted to upper-level positions in

---

[6] Plaintiff did not recall Donna's last name.

Administration, (Compl. ¶¶ 39-42).  Moreover, both Plaintiff and Lawson asserted that non-Latina employees made significant errors in the course of their employment but received less harsh discipline or none at all.  (*See* PUMF ¶ 76; Opp. Br. at 22; Lawson Dep. at 45, 53, ECF No. 24-7; Williams Dep. at 167-71).  Lawson testified that he was satisfied with Plaintiff's work during the approximately nine years she served as his secretary, he encountered no problems with her attendance at work, she made infrequent errors, and she was disliked by many of her co-workers who were jealous or believed she was underqualified for her position.  (Lawson Dep. at 34-38, 55-56, 69-71, 93).

Finally, Plaintiff contends that she was unlawfully retaliated against for filing the EEOC charge.  (Compl. Counts VIII-X, XIII, XV-XVI, XXIII; Opp. Br. at 43-45).  She claims that after Defendants received notice of her EEOC charge, an investigation into her work performance ensued, which led to her interview with Cunliffe on January 4, 2017, a hearing on March 7, 2017, and the two memoranda recommending her termination.  (*Id.*; DUMF ¶ 39; *see also* Riordan Cert. Exs. L, M, ECF Nos. 24-16, 24-17).  Based on the following language, she asserts that the Final Notice of Disciplinary Action explicitly stated that the EEOC charge was a reason supporting her discharge:

> **Incident(s) giving rise to the charge(s) and the date(s) on which they occurred.** . . . 13. On or about January 4, 2017, after becoming aware of this investigation and after being interviewed by Detective Sergeant Cunliffe, you filed an EEOC complaint charging discrimination and alleging fictious complaints against Chief Gregory Meyer, Lieutenant Robert DeSimone, Sergeant Peter La Rosa, and the Township Manager, Thomas Henshaw . . . .

(Riordan Cert., Ex. R ¶ 13).

Plaintiff alleges she was further retaliated against when multiple marked police cars arrived at her home to serve her with a Notice of Suspension on February 10, 2017, and a Notice

of Termination on March 10, 2017.  (Compl. ¶¶ 53-55; Opp. Br. at 45).  Lawson opined that

sending so many officers – who purportedly had their hands on their weapons – was an unusual

and unnecessary method to serve such notices upon an unarmed civilian.  (Lawson Dep. ECF

No. 24-7 at 82).

In the instant motions, Defendants seek summary judgment dismissal of all twenty-five

claims.  (ECF Nos. 24, 26).

## LEGAL STANDARD

### I.    SUMMARY JUDGMENT

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the

moving party demonstrates that there is no genuine issue of material fact and the evidence

establishes that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a

reasonable jury could return a verdict for the non-movant, and it is material if, under the

substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not

make credibility determinations or engage in any weighing of the evidence; instead, the non-

moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his

favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477

U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must

establish that a genuine issue of material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey

Township*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary

judgment cannot rest on mere allegations and instead must present evidence that creates a

genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; S*iegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130-31 (3d Cir. 1995); *see also* Fed. R. Civ. P. 56(e).

### DISCUSSION AND ANALYSIS

### I.  FEDERAL CLAIMS

In this action, Plaintiff asserts fourteen federal claims alleging: (1) age and race employment discrimination; (2) retaliation, and (3) hostile work environment, contrary to Title VII, 42 U.S.C. § 2000e, *et seq*., and 42 U.S.C. § 1981 ("Section 1981").  (Compl., Counts I-II, V-VI, VIII-IX, XII, XIV-XV, XVII, XX-XXI, XXIII, XXV).

### A.  TITLE VII

After receiving a right-to-sue letter from the EEOC, an employee may file a suit under Title VII in federal court within ninety days.  *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469-70 (3d Cir. 2001); *Seitzinger v. Reading Hosp. & Med. Ctr*., 165 F.3d 236, 239 (3d Cir. 1999).  The Third Circuit has "strictly construed the 90-day period and held that, in the absence of some equitable basis for tolling, a civil suit filed even one day late is time-barred and may be dismissed."  *Id*. at 470 (citation omitted).

Under the doctrine of equitable tolling, Title VII "plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances."  *Seitzinger*, 165 F.3d at 240 (collecting cases).  "A petitioner seeking equitable tolling bears the burden to show that [she] diligently pursued [her] rights and that some 'extraordinary circumstance stood in [the] way.'"  *Hanani v. State of N.J. Dep't of Envtl. Prot*., 205 F. App'x 71, 77 (3d Cir. 2006) (quoting *Satterfield v. Johnson*, 434 F.3d 185, 195 (3d Cir. 2006)).  For example, "[t]he Supreme Court has held that equitable tolling may be appropriate when a claimant received inadequate notice of her right to

12

file suit, where a motion for appointment of counsel is pending, or where the court has misled the plaintiff into believing that she had done everything required of her." *Seitzinger*, 165 F.3d at 240 (citing *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984)).  In addition, the Third Circuit has invoked equitable tolling in Title VII cases where "the defendant has actively misled the plaintiff; when the plaintiff 'in some extraordinary way' was prevented from asserting her rights; or when the plaintiff timely asserted her rights in the wrong forum."  *Id.* (citing *United States v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998)).  In sum, "[f]ederal courts invoke the doctrine of equitable tolling 'only sparingly,'" and only when the plaintiff can demonstrate that exceptional circumstances warrant a departure from the procedural requirements established by Congress.  *Midgley*, 142 F.3d at 179; *see also Baldwin*, 466 U.S. at 150-51.

Plaintiff's claims under Title VII are time-barred.  It is undisputed that the EEOC issued a right-to-sue letter to Plaintiff on August 3, 2017, and Plaintiff's complaint stated that she received same on August 8, 2017.[7]  (Compl. ¶ 4, ECF No. 1).  Plaintiff's Complaint was required to be filed within 90 days of receiving the right-to-sue letter, or by no later than November 6, 2017.  *Burgh*, 251 F.3d at 469.  However, Plaintiff's Complaint was filed on November 8, 2017 – 92 days after Plaintiff received the right-to-sue letter.  (*See* ECF Nos. 1; 27-1 at 8).  Accordingly, her Title VII claims are untimely and must be dismissed, unless the Court finds

---

[7] Plaintiff's counsel attached a "Certification of Counsel as to Receipt of Right to Sue Letter" to his response to questions from the Court on November 18, 2020.  There, for the first time, counsel asserts that his office received the right-to-sue letter "between August 8, and August 10, 2017."  (ECF No. 38 Ex. E).  He states that his mail has been delayed in the past because it was erroneously delivered to other tenants in his building, which hosts six different offices.  (*Id.*).  According to counsel's certification, "[m]ail is never delivered directly to [his] office and none of the offices are numbered."  (*Id.*).  Under the Sham Affidavit Doctrine, a court may disregard a contradictory affidavit or certification that appears to be asserted for the sole purpose of defeating summary judgment.  *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 392 (3d Cir. 2017); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007); *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006).  Counsel knew about his office's mail delivery issues when Plaintiff's complaint was filed, and he could have asserted that the right-to-sue letter was received between August 8 and 10 at that time.  He offers no explanation for disclosing that information at this late stage in the proceedings.  *See Daubert*, 861 F.3d at 392.  As a result, the Court construes this certification as an attempt to retroactively render Plaintiff's claims timely under Title VII: her complaint was filed two days late, and counsel's certification, if accepted, would shift the 90-day window by exactly two days in Plaintiff's favor.

13

"some equitable basis for tolling." *Id*. at 470.  Plaintiff has failed to articulate any viable basis for equitable tolling, and the Court cannot glean any exceptional circumstance that prevented her from adhering to the 90-day filing requirement.

As a final note, even if Plaintiff's Title VII claims were timely filed, Plaintiff would be unable to succeed on many of her Title VII claims.  Individual employees may not be held liable under Title VII in their personal capacity, *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077-78 (3d Cir. 1996) (en banc), nor in their official capacity when their employer is a co-defendant, *Mohamed v. Atl. Cty. Special Servs. Sch. Dist.*, No. CV1703911 (RBK/KMW), 2019 WL 1418123, at *5 (D.N.J. Mar. 29, 2019).  Moreover, age is not a protected category under Title VII, so Plaintiff's age discrimination claim against Lakewood under that statute would fail as a matter of law.  *See* 42 U.S.C. § 2000e-2.

For the foregoing reasons, Plaintiff's Title VII claims shall be dismissed with prejudice (Counts I, VI, IX, XVII, XXI, XXIII, XXV).

## B. SECTION 1981

Section 1981 grants individuals of all races equal rights under the law:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

The Supreme Court has held that an individual does not have a cause of action against a state or municipality under Section 1981 because "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed

14

in § 1981 by state governmental units." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).  The Third Circuit affirmed that holding in *McGovern v. City of Philadelphia*, stating that "[t]he mere mention of 'rights' does not, without more, establish a private right of action," especially where "Congress has already provided an effective means of vindicating a plaintiff's rights elsewhere in federal law."  554 F.3d 114, 119 (3d Cir. 2009).[8]  "Lower courts in this Circuit, and nonprecedential opinions from the Third Circuit, continue to follow *McGovern* on this point."  *Benjamin v. City of Atl. City*, No. CIV.A. 12-3471 (JBS), 2014 WL 884569, at *9 (D.N.J. Mar. 6, 2014).  Therefore, because Plaintiff does not bring a claim under Section 1983, the Court will dismiss with prejudice her Section 1981 claims against Lakewood for failure to state a claim upon which relief may be granted.  *See* 28 U.S.C. § 1915A(b)(1); *Smith v. Rebstock*, 570 F. App'x 171 (3d Cir. 2014); *Benjamin*, 2014 WL 884569, at *3.

Further, even if this Court recognized Plaintiff's cause of action against Lakewood under Section 1981, her claim would fail because she has not "allege[d] that the discrimination [s]he suffered was pursuant to an official policy or custom of the City."  *McGovern*, 554 F.3d at 121. The Supreme Court extended that requirement – initially set forth in *Monell*[9] for Section 1983 claims – to Section 1981 claims when it held that a plaintiff must show "the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the

---

[8] The parties submitted supplemental briefing, in response to questions from the Court, on the applicability of *Jett* and *McGovern* to the Section 1981 claims in this case.  Plaintiff acknowledged that under *McGovern*, Section 1981 does not provide a cause of action for damages against state actors, but maintains her argument that Lakewood can be held vicariously liable for the discriminatory acts of the individual defendants because they were acting pursuant to official policy or custom.  (ECF No. 38 at 4-6).  All four defendants argue that they are entitled to summary judgment on Plaintiff's Section 1981 claims because Section 1981 claims against state actors must be brought under 42 U.S.C. § 1983 ("Section 1983"), and Plaintiff's complaint did not allege that the individual employees acted pursuant to an official policy or custom.  (ECF No. 39 at 4; ECF 40 at 2, 4).  DeSimone also argues that even if Plaintiff had brought her claim for damages under Section 1983, he would be entitled to qualified immunity as a public official.  (ECF No. 40 at 2).

[9] *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

meaning of *Monell* and subsequent cases." *Jett*, 491 U.S. at 735.  The Third Circuit emphasized that a plaintiff must allege *in her complaint* that the municipality maintained an official discriminatory policy or custom in order to make a prima facie case under Section 1981. *McGovern*, 554 F.3d at 121 n.5.  Plaintiff's complaint alleged certain acts of discrimination but did not allege that they were carried out pursuant to an official Lakewood policy or custom.[10]

Plaintiff also asserts Section 1981 claims against Meyer, DeSimone, and Henshaw. Generally, an individual's rights under Section 1981 must be based on a contractual relationship. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 221 (3d Cir. 2015); 6 *Larson on Employment Discrimination* § 101.10 (2020).  However, the Third Circuit has held that "[i]f individuals are personally involved in the discrimination against the [plaintiff], and if they intentionally caused the [employer] to infringe on [plaintiff's] Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable."  *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604 (1987); *see also Pedro v. City Fitness, LLC*, 803 F. App'x 647, 652 n.9 (3d Cir. 2020); *Fitzpatrick v. County of Monmouth*, No. CIV.A. 08-299 (JAP), 2011 WL 2610252, at *6 (D.N.J. June 30, 2011).

Of the three individual Defendants, Plaintiff has only raised a genuine issue of material fact regarding DeSimone's harassment, which supports her claims for intentional discrimination and hostile work environment under Section 1981.  There is no evidence that Henshaw or Meyer

---

[10] In a November 18, 2020 brief responding to questions from the Court, Plaintiff argued that the individual defendants acted as decisionmakers and under the color of official policy when: (1) Henshaw authorized an investigation that led to Plaintiff's unlawful termination; (2) Meyer authorized numerous officers to deliver notices to Plaintiff's home in marked vehicles in an effort to intimidate her; and (3) Henshaw and Meyer segregated Latina women in the Records Room and subjected them to inferior working conditions compared to White women.  (ECF No. 38 at 5-6).  That was the first time Plaintiff alleged that discrimination by the individual defendants took place pursuant to official government policy and, to the Court's knowledge, there is no evidence in the record to support that argument.

participated in intentional discrimination.  To the extent they played a role in directing an investigation of Plaintiff and determining her promotions, reassignments, and termination, Defendants have proffered sufficient evidence of Plaintiff's errors and poor performance to demonstrate a legitimate, non-discriminatory basis for those decisions.  And there is insufficient evidence that Henshaw or Meyer personally directed or participated in the conduct that subjected Latinas like Plaintiff to a hostile work environment.[11]  Finally, Plaintiff's retaliation claim against DeSimone, Meyer, and Henshaw fails because there is insufficient evidence that any of those individuals were personally responsible for her termination or engaged in other acts of retaliation against her.[12]

Overall, Plaintiff's Section 1981 claims for intentional discrimination, hostile work environment, retaliation, and wrongful termination against Lakewood are dismissed with prejudice (Counts II, V, VIII, XII).  Summary judgment is granted in favor of the three individual defendants as to Plaintiff's Section 1981 claim for retaliation.  (Count XV).  Plaintiff has viable Section 1981 claims for intentional discrimination and hostile work environment against DeSimone only.  (Counts XIV, XX).  Those two claims against DeSimone will be discussed below.

   i.  HOSTILE WORK ENVIRONMENT

Plaintiff alleges that DeSimone engaged in the pattern and practice of intentional discrimination by his repeated sexually and racially offensive comments, and that his conduct created a hostile work environment.  Because Section 1981 applies to racial discrimination, only

---

[11] Plaintiff's claims against Lakewood for hostile work environment will be discussed further in Part II.B.iv, *supra*.

[12] Plaintiff's retaliation claims against Lakewood will be discussed further in Parts II.A and II.B.ii, *supra*.

DeSimone's racially offensive comments will be discussed here.[13]  Specifically, DeSimone commented that Lakewood might hire a "young blonde" with "nice boobs" while Plaintiff was on vacation, and questioned whether she would be allowed back into the United States from the Dominican Republic.  (PUMF ¶ 177; Williams Dep. at 146:8-15, ECF No. 30-2).  Plaintiff alleges that DeSimone made such comments "a lot of times . . . Every time that I would go on vacation, he would find that opportunity to say that."  (Williams Dep. at 148:22-149:3). DeSimone argues that that the alleged comments are only evidenced by Plaintiff's self-serving deposition testimony, were not severe or pervasive, and that there is no proof that they "detrimentally affected Plaintiff or would detrimentally affect a reasonable person."  (DeSimone Br. at 22, ECF No. 25-22; DeSimone Reply Br. at 9-10, ECF No. 31).

To establish a prima facie case of hostile work environment, a plaintiff must show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]."[14] *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (alterations in original) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

The Third Circuit has clarified that harassing conduct may be either severe *or* pervasive to qualify under the second prong, and that even a single instance of harassment can suffice to state a claim.  *Castleberry*, 863 F.3d at 264.  However, "'offhanded comments, and isolated incidents

---

[13] DeSimone's sexually inappropriate comments will be discussed in connection with Plaintiff's hostile work environment claim against Lakewood under NJLAD in Part II.B.iv, *supra*.

[14] Because this is an individual claim against DeSimone under Section 1981, vicarious liability will not be analyzed in this section.

(unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  *Id.*  A court must examine "the totality of the circumstances and factors such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 653 (E.D. Pa. 2012), *aff'd,* 565 F. App'x 88 (3d Cir. 2014) (quoting *Faragher*, 524 U.S. at 788).

Plaintiff has established a prima facie case of hostile work environment against DeSimone.  Far from offhanded comments or isolated incidents, DeSimone repeatedly targeted Plaintiff with inappropriate remarks that would have been inapplicable if she were white or non-Latina.  A reasonable person in Plaintiff's shoes would be detrimentally affected by hearing such comments on a regular basis.  Taken together, a reasonable factfinder could conclude that DeSimone's inappropriate comments were sufficiently pervasive or extreme to create a hostile work environment.

The parties' burdens in establishing and defending discrimination claims under Section 1981 are determined by the procedure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), whereby a plaintiff must first produce evidence sufficient for a reasonable factfinder to conclude that all elements of a prima facie case of discrimination are met. *Castleberry*, 863 F.3d at 263.  If a plaintiff establishes a prima facie case, "the 'burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action, and then the plaintiff bears the burden of establishing that the employer's

19

stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken." *Id.* at 263 (quoting *McDonnell Douglas*, 411 U.S. at 802-04).  Under the final step, a plaintiff may survive summary judgment by submitting evidence from which a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Under the first prong of Fuentes, a plaintiff "must present evidence that contradicts the core facts put forward by the employer as the legitimate reason for its decision." *Milham v. Cortiva Educ., Inc.*, No. CIV.A. 06-04226, 2007 WL 3146669, at *6 (E.D. Pa. Oct. 25, 2007), *aff'd*, 302 F. App'x 70 (3d Cir. 2008).  Under the second prong, a plaintiff "may show that the employer has previously discriminated against him, that the employer has previously discriminated against other members of the protected class or another protected class, or that the defendant has treated more favorably similarly situated people not within the protected class." *Id.* at *7.  Alternatively, a plaintiff might show "overt evidence of discriminatory animus or indirect evidence of an ulterior actionable motive for the adverse employment action." [15]  *Id.*

Here, DeSimone's comments were facially inappropriate and offensive, and DeSimone does not assert that they were non-discriminatory or offer a race-neutral explanation.  His argument that they were not extreme or pervasive is not compelling because Plaintiff alleges these comments occurred repeatedly over the course of several years.  As a result, he has not met his burden to show that he is entitled to summary judgment on Plaintiff's hostile work environment claim.

---

[15] The burden shifting scheme set forth in this paragraph shall be hereinafter referred to as the "*McDonnell Douglas* burden-shifting scheme."

ii.   I<small>NTENTIONAL</small> D<small>ISCRIMINATION</small>

The same behavior described above forms the basis of Plaintiff's intentional discrimination claim against DeSimone under Section 1981.  "To establish a discrimination claim under § 1981, 'a plaintiff must show (1) that [s]he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.'"  *Castleberry*, 863 F.3d at 266 (quoting *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010)).  Under the third prong, the following activities are covered by Section 1981: to "make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property."  42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" includes "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

DeSimone's comments satisfy the first two prongs of the above test, but they do not appear to satisfy the third prong because they did not interfere with Plaintiff's contractual relationship with her employer, Lakewood.  While Plaintiff claims Lakewood made several adverse employment decisions because she is Latina, none of those decisions are attributable to DeSimone's racially discriminatory comments.  As previously discussed, an individual may only be held liable under Section 1981 for his or her own personal discrimination, and DeSimone was not personally responsible for Plaintiff's termination, lack of advancement, or reassignments – that is, actions that interfered with Plaintiff's contractual employment.  As a result, Plaintiff has not established a prima facie case of intentional discrimination against DeSimone under Section 1981.

21

In sum, summary judgment will be granted as to all of Plaintiff's Section 1981 claims except for her hostile work environment claim against DeSimone (Count XX).

## II.   STATE LAW CLAIMS

In addition to the foregoing federal claims, Plaintiff asserts ten state law claims alleging age, sex, and race discrimination, hostile work environment, retaliation, and aiding and abetting discrimination, in violation of NJLAD, N.J. Stat. § 10:5-1, *et seq.* (Compl., Counts III, IV, VII, X, XI, XVI, XVIII, XIX, XXII, XXIV)   Plaintiff also asserts a claim against Lakewood under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. § 34:19-1, *et seq.* (Count XIII).

### A.   CEPA

In Count XIII, Plaintiff alleges that Lakewood subjected her to a "pattern and practice of retaliatory harassment and discriminatory conduct" which would not have occurred "but for the Plaintiff's complaints . . . regarding racism." (*Id.* ¶¶ 157-58)   She argues that her termination and the events leading up to it were retaliatory acts in response to her EEOC charge.

"CEPA was enacted in 1986 to protect from retaliatory action employees who 'blow the whistle' on employers engaged in illegal or harmful activity." *Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504, 512 (D.N.J. 1998), *aff'd,* 179 F.3d 81 (3d Cir. 1999).   The statute prohibits an employer from retaliating against an employee because that employee (1) "Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer" that the employee reasonably believes violates the law or is fraudulent or criminal; (2) "Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law" by the employer; or (3) "Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably

believes" violates the law, is fraudulent or criminal, or "is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J. Stat. 34:19-3.

In order to prove a CEPA violation, a claimant must prove

> (1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed whistle-blowing activity described in [CEPA]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Blackburn*, 179 F.3d at (quoting *Kolb v. Burns*, 727 A.2d 525, 530-31 (N.J. Super. Ct. App. Div. 1999)).  "The mere fact that a protected activity preceded an adverse employment action is not ordinarily sufficient to satisfy the plaintiffs burden of demonstrating a causal link between the two." *Lopez v. Lopez*, 997 F. Supp. 2d 256 (D.N.J. 2014).

Applying those principles, Plaintiff must raise a genuine dispute of material fact as to each element of a CEPA claim; namely, that (1) she reasonably believed Lakewood discriminated against her and other Latinas; (2) she performed a "whistle-blowing" activity; (3) an adverse employment action was taken against her; and (4) there was a causal connection between the whistle-blowing activity and the adverse employment action.

Courts in our district are divided on whether filing an EEOC claim constitutes protected whistle-blowing activity under the second prong.  *Compare Smith v. Travelers Mortg. Servs.*, 699 F. Supp. 1080, 1083 (D.N.J. 1988) *with Sandom v. Travelers Mortg. Servs., Inc.*, 752 F. Supp. 1240, 1244 (D.N.J. 1990).  However, Defendants primarily argue that the fourth prong is not met here – they assert that Plaintiff's conduct was under investigation *before* she filed the EEOC complaint and that she was terminated due to her incompetence, which was confirmed by

23

that investigation.  (Def. Moving Br. at 26; Def. Reply Br. at 19, ECF No. 32).  As such, they claim there is no causal link between Plaintiff's EEOC charge and her termination.  (*Id.*)  They also argue that Plaintiff did not engage in a protected whistle-blowing activity when she filed the EEOC complaint, not because filing such a charge can never be a whistle-blowing activity under CEPA, but because she did so in an attempt to save her job once she became aware that she was under investigation for her poor performance.  (Def. Reply Br. at 21-22; DeSimone Moving Br. at 19, ECF No. 25-22).  Supporting Defendants' argument is the fact that, during the months before Plaintiff filed her EEOC complaint, LTPD documented numerous instances of her poor performance.  (Riordan Cert. Ex. M, ECF 24-17).

Yet Plaintiff has raised a genuine issue of material fact regarding the quality of her work and the link between the filing of her EEOC charge and her termination.  First, Chief Lawson testified during deposition that he was satisfied with Plaintiff's work performance and attendance, and that she made infrequent errors during the nine years she worked as his secretary.  Second, Plaintiff's Final Notice of Disciplinary Action from LTPD explicitly stated that the EEOC charge was a reason supporting her discharge.  Third, Plaintiff challenges the admissibility of Defendants' documentation of her errors and poor performance.  Fourth, she contends that other employees were responsible for her alleged errors.  Those facts undermine Defendants' position that Plaintiff's poor performance, and not her EEOC charge, was the basis for her investigation and subsequent termination.

Because there is a genuine dispute of material fact regarding the causal link between Plaintiff's EEOC charge and her termination, summary judgment is denied as to Count XIII.

### B.   NJLAD

Plaintiff has asserted the same NJLAD claims against both Lakewood and the three individual Defendants -- Meyer, DeSimone, and Henshaw – in their official capacities. NJLAD proscribes discrimination by an employer against an employee.  Usually, a supervisor does not constitute an employer under NJLAD.  *K.J. v. Greater Egg Harbor Reg'l High Sch. Dist. Bd. of Educ.*, 431 F. Supp. 3d 488, 514 (D.N.J. 2019); *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016); *Lopez*, 997 F. Supp. 2d at 276 (citing *Cicchetti v. Morris Cty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. Sup. Ct. 2008)).  However, a plaintiff may bring an "aiding and abetting" claim against an individual employee for an NJLAD violation.  *See id.* Therefore, even if Plaintiff succeeds in her NJLAD claims against Lakewood, she can only hold the three individual Defendants liable if they aided or abetted Lakewood's discrimination.  In short, Plaintiff can only hold the three individual Defendants liable for aiding and abetting under NJLAD, and only if she can prove that Lakewood is liable for the underlying NJLAD violations (intentional discrimination, retaliation, racially disparate impact, or hostile work environment).

As another generally applicable matter, all NJLAD claims are governed by a two-year statute of limitations.  *Montells v. Haynes*, 627 A.2d 654, 659 (N.J. Sup. Ct. 1993); *accord Crump v. Applied Landscape Techs.*, No. CIV. 2:13-5574 (KM/MAH), 2014 WL 2040096, at *6 (D.N.J. May 16, 2014).  "New Jersey recognizes the 'continuing violation doctrine,' which provides that when an individual experiences a 'continual, cumulative pattern of tortious conduct' the limitations period begins only when the wrongful action ceases." *Sgro v. Bloomberg L.P.*, CIV.A. No. 05-731 (FLW), 2008 WL 918491, at *5 (D.N.J. Mar. 31, 2008), *aff'd in part, rev'd in part and remanded*, 331 F. App'x 932 (3d Cir. 2009) (citing *Wilson v. Wal-Mart Stores*, 729 A.2d 1006 (N.J. Sup. Ct. 1999)).  The continuing violation doctrine does not

apply to discrete employment acts, such as a termination, transfer, or denial of promotion – those decisions are not actionable if time-barred, even if they relate to acts in timely-filed claims. *Roa v. Roa*, 985 A.2d 1225, 1231-32 (N.J. Sup. Ct. 2010).

Finally, "[a]ll LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism" set forth in *McDonnell Douglas*. *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 619 (N.J. Sup. Ct. 2013).

The following facts form the basis of Plaintiff's NJLAD claims for discrimination and hostile work environment. First, she alleges that Lakewood denied her advancement opportunities – including several anticipated promotions – and equal employment conditions based on her race. (Compl. ¶¶ 25, 27, 30, 37-42, 74). Second, she alleges that Lakewood had a practice of compensating Latinas less than their non-Latina counterparts and relegating them to the Records Room to do low-level, undesirable work, while being harassed for speaking Spanish and asking to use the restroom. (Compl. ¶¶ 48-50, 73). As previously described, she also cites numerous derogatory comments by her supervisor, DeSimone, that discriminated against her as a Latina woman. Further, Plaintiff argues that she was the subject of an unauthorized investigation, replaced by white women after her final transfer from Administration to the Records Room, and that non-Latina employees who made errors similar to hers received either less harsh consequences or none at all. (Opp. Br. at 18, 22, 37-38, 44; Williams Dep. at 167-71).

## i. INTENTIONAL DISCRIMINATION

NJLAD prohibits employers from discharging or discriminating against employees on the basis of race, color, national origin, ancestry, sex, and age, among other categories. N.J. Stat. 10:5-12(a). Plaintiff sets forth claims for age, sex, and racial

discrimination under that statute.  (Compl. Counts XVIII, XXIV).  A discussion of each type of claim follows.

### AGE

Plaintiff alleges that Meyer, DeSimone, and Henshaw – but not Lakewood – violated NJLAD's prohibition on age discrimination.  (Compl., Count XXIV).  Her age discrimination claim against the three individual Defendants fails because, as previously discussed, individuals can only be held liable for an NJLAD violation under the statute's aiding and abetting provision.  Therefore, Plaintiff can only hold the three individual Defendants liable for aiding and abetting Lakewood's age discrimination.  Although Plaintiff does not allege age discrimination against Lakewood, the Court will analyze that claim for the purpose of ascertaining the individual Defendants' potential liability for aiding and abetting.

"In cases alleging age discrimination under the New Jersey Law Against Discrimination (NJLAD), 'an employee must show that the prohibited consideration, age, played a role in the decision making process and that it had a determinative influence on the outcome of that process.'"  *Buchholz v. Victor Printing, Inc.*, 877 F. Supp. 2d 180, 185 (D.N.J. 2012) (quoting *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 953 (N.J. Sup. Ct. 1999)).

> [T]o establish a *prima facie case* of unlawful termination under the NJLAD in the context of age discrimination, [Plaintiff] must demonstrate (1) that she belongs to a protected class, (2) that she was qualified for the position held, (3) that she was terminated despite adequate qualifications, and (4) a logical basis on which to find that [Lakewood's] decision to terminate her was affected significantly by her age.

*Arenas v. L'Oreal USA Prods., Inc.*, 790 F. Supp. 2d 230, 236 (D.N.J. 2011), *aff'd,* 461 F. App'x 131 (3d Cir. 2012).  *See also Fintel v. Marina Dist. Dev. Co.*, LLC, No. CV 16-8798 (NLH/KMW), 2019 WL 1418122, at *5 (D.N.J. Mar. 28, 2019).  The fourth element may be

satisfied by "showing that the plaintiff was replaced with a 'candidate sufficiently younger to permit an inference of age discrimination.'" *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 302-03 (3d Cir. 2004).  Alternatively, a plaintiff may demonstrate "a logical basis on which to find that a plaintiff's termination was significantly affected by his or her age." *Arenas*, 790 F. Supp. 2d at 237-38.

First, the parties dispute whether Plaintiff was adequately qualified,[16] and there is substantial evidence that she was terminated due to her poor performance, which cost Lakewood tens of thousands of dollars.  Further, she has not sufficiently demonstrated "a logical basis on which to find that [Lakewood's] decision to terminate her was affected significantly by her age." *Arenas*, 790 F. Supp. 2d at 236.  The only purported evidence of age discrimination appears to be DeSimone's comment that by the time she returned from her vacation, Lakewood may have hired a "blonde young female" with "nice boobs."  (Williams Dep. at 148:4-23).  Plaintiff has stated that she was replaced with a younger white woman after she was transferred from Administration to Records, but neither proffered evidence that the replacement was "sufficiently younger" to permit an inference of age discrimination, *see Monaco*, 359 F.3d at 302-03, nor drew a logical nexus between DeSimone's comment and her transfer or termination.  Further, there is no evidence that Plaintiff was replaced with a younger woman after she was terminated. Overall, the evidence submitted by Plaintiff does not permit a reasonable factfinder to conclude that Lakewood's decision to discharge Plaintiff was based on her age.  Because Plaintiff cannot

---

[16] Plaintiff relies on Lawson's testimony to support her argument that she was qualified for the position of "Principal Clerk Transcriber Bilingual Spanish to English or Clerk 3." (*See* Lawson Dep. at 34:17-35:3, 68:8-16; 69:6-17; Opp. Br. at 31-33).  She also notes that in her fourteen years of employment with LTPD, she did not receive any performance evaluations "identifying her weaknesses or necessary improvements." (Opp. Br. at 40).  Defendants, on the other hand, argue that Plaintiff was not qualified for her position because, among other things, she dropped out of high school and then took college courses at a questionable institution; failed a typing test; possessed poor grammar and writing skills; and committed errors in the performance of her work duties.  Defendants also question the veracity of Plaintiff's allegations that she obtained a General Education Development diploma.

establish a prima facie case of age discrimination against Lakewood, she would also be unable to hold Meyer, DeSimone, and Henshaw individually liable on an aiding and abetting theory.

Because there is no basis to hold Meyer, DeSimone, and Henshaw individually liable under NJLAD, Plaintiff's claim against those Defendants is dismissed with prejudice for failure to state a claim upon which relief may be granted (Count XXIV).

### RACE

Plaintiff alleges that all Defendants – Lakewood, Meyer, DeSimone, and Henshaw – engaged in racial discrimination in violation of NJLAD.  (Compl. Counts III, XVIII). Because there is no individual liability under NJLAD, the Court will only consider Plaintiff's claim against Lakewood.

An employer may violate NJLAD if it makes an employment decision based on an employee's race rather than on her conduct or qualifications.  The statute states that an employer may not, on the basis of race, "refuse to hire or employ or to bar or to discharge or require to retire . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.J. Stat. 10:5-12. "Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class."  *May v. PNC Bank*, 434 F. Supp. 3d 284, 297 (E.D. Pa. 2020).  For example, an employee within a protected class may have a cause of action under NJLAD if they are paid less than an employee outside that class for the same work. *See, e.g.*, *Casper v. Paine Webber Grp., Inc.*, 787 F. Supp. 1480, 1511 (D.N.J. 1992); *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 912-13 (N.J. Sup. Ct. 1990).

The Third Circuit has acknowledged that there is rarely direct evidence of an employer's intent to discriminate; as a result, plaintiffs often seek to prove discrimination by inference or process of elimination.  *Marzano v. Comput. Sci. Corp. Inc.*, 91 F.3d 497, 507-08 (3d Cir. 1996).  To do so, a plaintiff must establish "(1) that their employer took an adverse employment action against them; (2) that the facts of the case are compatible with discrimination being the reason; (3) that the employer is unable to provide an alternative nondiscriminatory reason for the action, or that its stated reason is false."  *Id.* at 508.  "The evidentiary burden at the *prima facie* stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action.'"  *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. Sup. Ct. 2005) (quoting *Marzano*, 91 F.3d at 508).  After a prima facie case is demonstrated, the *McDonnell Douglas* burden-shifting framework applies.  *Marzano*, 91 F.3d at 508-09; *Victor v. State*, 4 A.3d 126, 140-41 (N.J. Sup. Ct. 2010).

Applying those principles to the present case, Plaintiff would need to demonstrate that racial discrimination could have been the underlying reason for Lakewood's adverse employment acts.  Plaintiff has met that burden for at least some of the alleged discriminatory treatment: it is possible for a reasonable factfinder to believe that racial discrimination was the motive behind (1) demoting Plaintiff from a higher level position in Administration to the Records Room and denying her promotions (Opp. Br. at 37-38; Compl. ¶ 74); (2) staffing the Records Room primarily with Latinas who are denied raises and opportunities for advancement, and harassed for speaking Spanish and asking to use the restroom, (Opp. Br. at 34-36); (3) replacing Plaintiff and other Latinas in Administration with white women, (PUMF ¶ 133 (disputed); Opp. Br. at 17, 38); (4) paying Latinas less than their white counterparts, (Compl. ¶

73); and (5) disciplining Plaintiff more harshly than her non-Latina co-workers for similar errors, (PUMF ¶ 183 (disputed); Lawson Dep. at 15:6-22; Williams Dep. at 167-71).

Some of the above allegations are time-barred because they occurred more than two years before Plaintiff filed her claim on November 8, 2017.  For example, Plaintiff alleges that between 2005 and 2012, her requests for promotion were ignored and ultimately denied, and she was transferred from Administration to the Records Room.  (Compl. ¶¶ 24-27, 30).  However, Plaintiff was reassigned to the Records Room again in August 2016, which falls within the two-year statute of limitations for a discrete employment action.  Many of her other allegations meet the standard for a "continuing violation," such as harassment and unequal treatment of Latinas.

Defendants offer legitimate, race-neutral reasons for some of the employment decisions in question.  They submit documentary and testimonial evidence indicating that Plaintiff was suspended and/or reprimanded on multiple occasions after committing a series of billing errors and mishandling checks.  (*See, e.g.*, DDUMF ¶ 10; DUMF ¶ 7; Riordan Cert. Exs. E, G). Further, the two memoranda issued by Cunliffe provide a detailed list of Plaintiff's missteps and job performance issues.  (Riordan Cert. Exs. L, M).  Defendants claim that Plaintiff's errors, unexcused absences, and poor performance prevented her from advancing and formed the basis for her investigation and transfer to the Records Room.  They also insist that employees of different races work in the Records Room.  However, they do not provide an alternative explanation for Plaintiff's other grievances.  Defendants' arguments center around the assertion that Plaintiff was terminated due to her own incompetence which, while somewhat persuasive, is not responsive to Plaintiff's allegations that she was subjected to various forms of race- and sex-based discrimination over the course of many years.

Further, Plaintiff argues that those race-neutral explanations are mere pretext: she challenges the validity of Defendants' evidence documenting her errors and attendance problems, claims she did not have sole control of or responsibility for the alleged billing errors, and cites specific billing errors by white co-workers that went unpunished.  (*See, e.g.*, Opp. Br. at 10-13, 19-24, 34-38; Pl. Statement of Contested Material Facts Opp. DeSimone's Mot. Summ. J. ¶¶ 10-12, 18-23, 25, 28-32, 39-43, 50. ECF No. 27-2; Pl. Statement of Contested Material Facts Opp. Lakewood, Henshaw & Meyer Mot. Summ. J. ¶¶ 2, 9, 14, 17-22, 24-26, 28-30, 35-37, 40, ECF No. 27-3).  She relies on Lawson's testimony that she was an "excellent employee" who possessed the "abilities" to perform her job, (*see* Lawson Dep. at 68:8-16; 69:6-17); had a good attendance record and "was very diligent in her duties," (*id.* at 34:17-35:3); and was able to handle nearly all the duties of an employee who left in addition to her own responsibilities, (*id.*). Therefore, Plaintiff has raised a genuine issue of material fact regarding several examples of anti-Latina discrimination at LTPD.

As a result, summary judgment is denied as to Plaintiff's claim against Lakewood for intentional discrimination under NJLAD (Count III).  Plaintiff's identical claims against Meyer, DeSimone, and Henshaw are dismissed with prejudice for failure to state a claim upon which relief may be granted (Count XVIII).

   ii.  RETALIATION

In Count XVI, Plaintiff sets forth a claim for retaliation under NJLAD.  Similar to CEPA, NJLAD contains a provision that makes it unlawful for

> any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or

> interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

N.J. Stat. 10:5-12(d).

However, CEPA has a waiver provision that bars a plaintiff from bringing substantially similar retaliation claims under both CEPA and NJLAD.  The waiver provision provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law."  N.J. Stat. 34:19-8.  The Supreme Court of New Jersey has interpreted that provision to mean that "a former employee forfeits his or her common-law retaliatory-discharge cause of action when he or she 'institutes' a CEPA cause of action."  *Young v. Schering Corp.*, 660 A.2d 1153, 1159-60 (N.J. Sup. Ct. 1995).  However, "the waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA," and not "to those causes of action that are substantially independent of the CEPA claim."  *Id.* at 1160.

Guided by those principles, New Jersey district courts have held that "other State law causes of action arising out of the same allegations supporting a CEPA claim are precluded by the bringing of a claim under CEPA."  *Blakey v. Cont'l Airlines, Inc.*, No. CIV. 93-2194 (WGB), 1995 WL 464477, at *2 (D.N.J. June 16, 1995).  In *Blakey*, the court drew a fine line between the plaintiff's NJLAD and CEPA causes of action.  Under NJLAD, the plaintiff – a commercial pilot – alleged that after she complained to her supervisors about sexual harassment, her coworkers retaliated by putting pornographic material and offensive notes in her plane's cockpit.  *Id.* at *1. Under CEPA, she alleged that her employer engaged in sex discrimination following her complaints by denying her access to flight information, disciplining her more harshly than her

male counterparts for the same behavior, and denying her paid leaves of absence while granting same to male pilots for similar injuries. *Id.* at *1, 3. Although the court acknowledged that plaintiff's NJLAD and CEPA claims were "intricately intertwined," it found that they were "based upon separate sets of facts" and could "therefore be simultaneously maintained." *Id.* at 3.

In *Ayres v. Mafco Worldwide Corp.*, the plaintiff asserted NJLAD claims alleging that his employer retaliated against him after he requested an accommodation for his disability and filed an EEOC discrimination complaint. No. CV 18:12071 (RBK), 2019 WL 581342, at *2 (D.N.J. Feb. 13, 2019). The court found the retaliation claim that was based on his discrimination complaint was waived because it was "not substantially independent" from his CEPA claim, but his other retaliation claim could proceed because "it relate[d] to the request for accommodation and thus will not be waived." No. CV 18:12071 (RBK), 2019 WL 581342, at *5 (D.N.J. Feb. 13, 2019).

By contrast, in *Bowen v. Parking Authority of City of Camden*, the court rejected plaintiffs' argument that their CEPA and NJLAD claims were distinct where the former alleged retaliation based on their complaints about civil rights violations, and the latter alleged retaliation based on their complaints about corruption and other unlawful conduct. No. CIV. 00-5765 (JBS), 2003 WL 22145814, *24 (D.N.J. Sept. 18, 2003). In finding that the two causes of action were not independent, the court noted that both were "based on allegations that plaintiffs were discharged or suspended because they blew the whistle on defendants' violations of law." *Id.* Therefore, it granted the defendant's motion for summary judgment as to the NJLAD claim because it fell within the CEPA waiver provision. *Id.*

In the present case, Plaintiff must prove that her NJLAD claim for retaliation is substantially independent from her CEPA claim. As the basis of both causes of action (X and

XIII), Plaintiff's complaint describes the retaliatory, harassing, and discriminatory treatment – in particular, her termination – that she experienced as a result of her complaints regarding racial discrimination.  Those claims appear to be identical – the same facts allegedly gave rise to the same unlawful conduct.  Therefore, Plaintiff's NJLAD retaliation claim is waived pursuant to the CEPA waiver provision because it is duplicative.  *See Smith v. Township of E. Greenwich*, 519 F. Supp. 2d 493, 510 (D.N.J. 2007), *aff'd*, 344 F. App'x 740 (3d Cir. 2009), *as amended* (Nov. 3, 2009).

For the foregoing reasons, Lakewood is entitled to summary judgment on Count X. Because there is no basis for individual liability under NJLAD, Plaintiff's identical claim against Meyer, DeSimone, and Henshaw (Count XVI) is dismissed with prejudice for failure to state a claim upon which relief may be granted.

### iii.  DISPARATE IMPACT

In Count IV and XIX, Plaintiff asserts that Defendants maintained certain policies and practices that had a racially disparate impact – in particular, compensating Latinas less than their non-Latina co-workers for the same work – in violation of NJLAD.  As previously discussed, the Court will only consider Plaintiff's claim against Lakewood (Count IV) and will dismiss her identical claim against the three individual Defendants (Count XIX).

"The New Jersey Supreme Court has held that a disparate impact claim's requirements under the NJLAD are based upon the requirements of federal law." *Petruska v. Reckitt Benckiser, LLC*, No. CIV.A. 14-03663 (CCC), 2015 WL 1421908, at *6 (D.N.J. Mar. 26, 2015) (citing *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233 (N.J Sup. Ct. 2005)).  "[A] disparate impact violation arises when an employer is shown to have used a specific employment practice, neutral on its face, but causing a substantial adverse impact on a protected group and

which cannot be justified as serving a legitimate business goal of the employer." *Hashem v. Hunterdon County*, No. CV158585 (FLW/DEA), 2016 WL 5539590, at *14 (D.N.J. Sept. 29, 2016) (citing *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011)).

To establish a disparate impact claim, a plaintiff must: (1) "identify the specific practice(s) alleged to have created a disparate impact," and (2) "show that this practice caused observable statistical differences affecting the protected class." *Petruska*, 2015 WL 1421908, at *6. "To prove the second requirement, plaintiffs often use 'statistics from which it may be inferred that the employer's employment practice significantly disadvantaged employees [in the protected class]." *Bratek v. TD Bank, N.A.*, No. CIV. 11-3049 (RBK/KMW), 2012 WL 603299, at *6 (D.N.J. Feb. 22, 2012) (quoting *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1259 (D.N.J. 1994), *aff'd,* 67 F.3d 291 (3d Cir. 1995)). Moreover, "[a]n adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact." *Schiavo v. Marina Dist. Dev. Co., LLC*, 123 A.3d 272, 285 (N.J. Super. Ct. App. Div. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 121 (3d Cir. 1983)).

According to the Supreme Court, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)).

Here, Plaintiff has failed to set forth a prima facie case of disparate impact. First, Plaintiff does not identify a facially *neutral* employment practice or policy that had a substantial, adverse impact on a protected group. Rather, Plaintiff asserts that Lakewood maintained a

facially *discriminatory* practice in its treatment of Latina employees.  *See Bratek*, 2012 WL 603299, at *6-7.  Second, Plaintiff proffers no specific evidence – statistical or otherwise – to support her claim of disparate impact on the protected class.  *See N.A.A.C.P. v. City of Bayonne*, 134 F.3d 113, 121 (3d Cir. 1998).  Generally asserting that Latinas are paid less than their non-Latina co-workers cannot form the basis of a disparate impact claim.  *See Smith*, 544 U.S. at 241; *Schiavo*, 123 A.3d at 285.  There is no way for the Court to discern how many Latinas are affected and whether they have the same qualifications and responsibilities as the non-Latinas who are allegedly paid more.

In sum, Plaintiff has not established a prima facie disparate impact claim, and Lakewood is entitled to summary judgment on Count IV.  The Court dismisses with prejudice Plaintiff's identical claim against the three individual Defendants for failure to state a claim upon which relief may be granted. (Count XIX).

### iv.    HOSTILE WORK ENVIRONMENT

In Counts VII and XXII, Plaintiff alleges that Defendants violated NJLAD by creating a hostile work environment.  As previously discussed, the Court will only consider Plaintiff's claim against Lakewood because there is no individual liability under NJLAD.

To establish a cause of action under NJLAD for a hostile work environment, Plaintiff "must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive."  *Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611, 625 (N.J. Sup. Ct. 2002) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 448 (N.J. Sup. Ct. 1993)).  *See also Srgo*, 2008 WL 918491, at *16.  A court must examine "the totality of the

circumstances and factors" when considering a hostile work environment claim.  *Miller*, 908 F.

Supp. 2d at 653; *Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 530 (E.D. Pa. 2014).

The specific hostile and discriminatory acts Plaintiff alleges are: (1) sexually and

racially offensive comments by DeSimone (including that Lakewood might hire a young blonde

with nice boobs while Plaintiff was on vacation, questioning whether she would be allowed back

into the United States based on her immigration status, and asking why she couldn't find a man)

(Compl. ¶¶ 15-16, 45; PUMF ¶ 177; Williams Dep. at 146:8-15, 148:4-23, 159:20-160:3); (2)

continuous negative treatment by her co-workers and supervisors that was rooted in anti-Latina

racism, (Compl. ¶¶ 12-14; Williams Dep. at 171-72; Williams Cert. ¶¶ 17, 18); (3) denial of the

accommodations, training, and tools needed to perform her work (Compl. ¶¶ 46-48; Opp. Br. at

14); and (4) harsh treatment directed at Latina employees, including harassment for speaking

Spanish or requesting a bathroom break, (Compl. ¶¶ 49-50).  These actions are not discrete

employment decisions and, therefore, even if some of them occurred more than two years before

Plaintiff filed her complaint, they are covered by the continuing violation doctrine.

In considering the totality of the evidence, a reasonable factfinder could conclude that

Plaintiff has established a prima facie case of hostile work environment.  As such, the *McDonell*

*Douglas* burden shifting framework applies.  *Lassiter v. Children's Hosp. of Phila*, No. CIV.A.

05-CV-6834, 2008 WL 304891, at *5 (E.D. Pa. Jan. 31, 2008).

Lakewood offers the following race-neutral explanations for the alleged harassment.

First, it asserts that Plaintiff's colleagues did not like her because she was incompetent and

unqualified for her position, and that Plaintiff was not treated differently from other LTPD

employees of different sexes and races.  (Def. Moving Br. at 23, 25).  Second, it argues that

isolated comments cannot support a claim for hostile work environment, and that Plaintiff has

failed to allege specific discriminatory conduct due to her race or sex.  (Def. Reply Br. at 7-8).
But Plaintiff has articulated numerous instances of sex- and race-specific harassment and alleges
that Defendants did not maintain or enforce adequate policies and procedures to prevent such
conduct.  And while Defendant describes legitimate, non-discriminatory reasons for Plaintiff's
*termination*, it does not attempt to explain or defend the specific sex- and race-based *harassment*
Plaintiff alleges occurred over the course of several years, including the treatment of Latinas in
the Records Room and repeated comments by DeSimone.  Overall, Defendant has not met its
burden of articulating legitimate, non-discriminatory reasons for the harassment of Plaintiff and
other Latinas.

   Unlike Plaintiff's other NJLAD claims, which involved official employment
decisions by Lakewood, her hostile work environment claim is based on conduct by her
supervisors and co-workers.  An employer's liability for workplace harassment by its employees
is based on the notion that "[w]hen an employer knows or should know of the harassment and
fails to take effective measures to stop it, the employer has joined with the harasser in making the
working environment hostile."  *Lehmann*, 626 A.2d at 464.

   In *Lehmann*, the Supreme Court of New Jersey held that "when an employee
raises a hostile work environment discrimination claim against a supervisor . . . an employer will
be strictly liable for equitable damages and relief."  626 A.2d at 448.  For damages beyond
equitable relief, agency principles apply:

> An employer will be found vicariously liable if the supervisor acted
> within the scope of his or her employment.  Moreover, even if the
> supervisor acted outside the scope of his or her employment, the
> employer will be vicariously liable if the employer contributed to
> the harm through its negligence, intent, or apparent authorization of
> the harassing conduct, or if the supervisor was aided in the
> commission of the harassment by the agency relationship.

*Id.* at 464.  "An employer will not be liable for punitive damages unless the harassment was authorized, participated in, or ratified by the employer."  *Id.* at 448.  Further, an "employer cannot be held liable when it responds in a manner which stops the harassment."  *Nuness v. Simon & Schuster, Inc*, 221 F. Supp. 3d 596, 604 (D.N.J. 2016).

Because Plaintiff seeks compensatory and punitive damages rather than equitable relief, she has the additional burden of proving that Lakewood could be vicariously liable for the acts of its individual employees.  In her complaint, she alleges that Lakewood has inadequate policies and procedures in place to prevent and report discrimination, and that it failed to follow the procedures that were in existence.  (Compl. ¶¶ 20-21).  Lawson testified that on at least two occasions, employees were counseled or reprimanded for offensive conduct directed at Plaintiff: (1) a white co-worker was reprimanded after circulating a derogatory email about Plaintiff, (ECF No. 24-7 at 58); and (2) Lawson counseled DeSimone after he commented that Lakewood might hire a blonde secretary with nice boobs while Plaintiff was on vacation, (ECF No. 24-7 at 113), although Plaintiff alleges DeSimone made similar comments every time she went on vacation (Williams Dep. at 148-49).  Lawson said he did not initiate an Internal Affairs investigation because Plaintiff did not wish to make a formal complaint.  (*Id.*)

The record does not show whether DeSimone was counseled or disciplined for his other sexually and racially inappropriate comments.  While Lawson testified that he counseled DeSimone after at least one of his inappropriate comments, it is not clear whether any institutional action was taken to systemically address DeSimone's offensive comments to Plaintiff and other employees.  (*See, e.g.*, Williams Dep. at 155-56 (DeSimone asked another female employee to "show him . . . her boobs")).  Indeed, Plaintiff testified that she notified Lawson on numerous occasions after DeSimone made inappropriate comments to her, and that

Lawson responded at least once that DeSimone was "just fooling around" or "didn't really mean that." (Williams Dep. at 157-59). It is also not clear whether Plaintiff attempted to file formal complaints for the conduct in question, or whether Lakewood has adequate measures in place to deter discrimination. While Lakewood may have addressed a few instances of the alleged offensive conduct, it appears those measures were ineffective to stop the continued harassment.

Overall, Plaintiff has established a prima facie case of hostile work environment and raised a genuine issue of material fact regarding Lakewood's vicarious liability for its employee's sexual and racially discriminatory conduct. As such, Lakewood's motion for summary judgment is denied as to Plaintiff's claim for hostile work environment (Count VII). Plaintiff's identical claim against the three individual Defendants (Count XXII) is dismissed with prejudice for failure to state a claim upon which relief may be granted.

v.     AIDING AND ABETTING

In Count XI, Plaintiff alleges that Meyer, DeSimone, and Henshaw aided and abetted Lakewood's violations of NJLAD. As previously discussed, individual employees can only be held liable for aiding and abetting their employer's underlying NJLAD violations. *See* *K.J.* at 514 (citing *Monaco*, 359 F.3d at 307 n.15). In the foregoing sections, the Court determined that Plaintiff established a prima facie case for intentional discrimination and hostile work environment against Lakewood. Accordingly, those are the only two violations that can form the basis of an aiding and abetting claim against the three individual Defendants. In addition, the Court must analyze each Defendant's conduct to determine his individual liability for aiding and abetting.

NJLAD makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NJLAD], or to attempt to do so."  N.J. Stat. 10:5-12(e).

> To establish an aiding and abetting claim under the NJLAD, a plaintiff 'must demonstrate that the defendants: (1) aided another in performing a wrongful act that caused an injury; (2) were aware of their role in the illegal activity at the time it was committed; and (3) knowingly and substantially assisted with the main violation.'

*K.J.*, 431 F. Supp. 3d at 514 (citing *Yuli v. Lakewood Bd. of Educ.*, Civ. No. 13-4617, 2014 WL 5308187, at *9 (D.N.J. Oct. 16, 2014)).  *See also Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. Sup. Ct. 2004).  In *Tarr v. Ciasulli*, the Supreme Court of New Jersey listed five factors to determine whether a defendant provided "substantial assistance" under the third prong: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." 853 A.2d at 929.

Aiding and abetting "require[s] active and purposeful conduct."  *Tarr*, 853 A.2d at 928-29.  Simply having responsibility over employees and the workplace, or failing to protect an employee from discrimination, falls short of that standard.  *Cicchetti*, 947 A.2d at 646.

In addition, "courts construe the aiding and abetting theory broadly, such that an individual supervisor can aid and abet his own conduct."  *O'Toole*, 203 F. Supp. 3d at 467. "[A]ny suggestion that N.J.S.A. 10:5-12(e) permits individual liability for a supervisor who encourages or facilitates another employee's harassing conduct, while precluding individual liability for the supervisor based on his or her own discriminatory or harassing conduct, appears to us to be untenable."  *Id.* at 467-68 (quoting *Rowan v. Hartford Plaza Ltd.*, No. A–0107–11T3, 2013 WL 1350095, at *8 (N.J. Super. Ct. App. Div. 2013)).

The only Defendant against whom Plaintiff makes specific allegations of discriminatory conduct is DeSimone.  Plaintiff can establish a prima facie case of aiding and abetting a hostile work environment based on DeSimone's ongoing, inappropriate comments. First, DeSimone performed a wrongful act that caused an injury – he engaged in purposeful and repeated conduct that created a hostile work environment for Plaintiff and other employees within her protected class.  He was undoubtedly aware that his comments were inappropriate and offensive, and thus satisfies the second prong.  Under the third prong, DeSimone can be held liable for aiding and abetting his own conduct as Plaintiff's supervisor.  *See O'Toole*, 203 F. Supp. 3d at 467.

While a reasonable factfinder could conclude that DeSimone aided and abetted a hostile work environment, there is insufficient evidence that he played a personal role in the instances of racial discrimination that Plaintiff alleges against Lakewood.  Plaintiff does not set forth specific acts by DeSimone that contributed to, *inter alia*, her lack of advancement, assignment to the Records Room, harsher discipline compared to her non-Latina co-workers, or the alleged disparate treatment and compensation of Latinas at LTPD.

Similarly, Plaintiff does not allege specific acts by Meyer or Henshaw that aided and abetted a hostile work environment or intentional discrimination.  She generally states that all three individual Defendants played a role in delaying and denying her promotion and sending five marked police cars to deliver her notice of termination at her home.  (Compl. ¶¶ 40, 42, 53-55).  However, to succeed on an aiding and abetting claim, Plaintiff must show purposeful and active conduct that Defendants knew were illegal or wrongful.  *K.J.*, 431 F. Supp. 3d at 514; *Tarr*, 853 A.2d at 928-29.  To the extent Defendants denied Plaintiff's application for promotion or transferred her to the Records Room, there is no indication that they believed those decisions

were based on illegal discrimination.  In fact, Defendants maintain that their employment decisions were based on Plaintiff's poor performance and errors.  And while Plaintiff has defeated summary judgment on her intentional discrimination claim against Lakewood, there is little to no specific evidence that the three individual Defendants purposefully and substantially assisted Lakewood's violation such that they can be held personally liable for aiding and abetting.

Overall, summary judgment is granted in favor of Henshaw and Meyer as to Plaintiff's aiding and abetting claim.  Summary judgment is denied only as to Plaintiff's claim that DeSimone aided and abetted a hostile work environment.

### CONCLUSION

In conclusion, Plaintiff has presented a genuine dispute of material fact regarding the following claims: (1) Count III for intentional discrimination under NJLAD against Lakewood; (2) Count VII for hostile work environment under NJLAD against Lakewood; (3) Count XI for aiding and abetting a hostile work environment under NJLAD against DeSimone only; (4) Count XIII for retaliation under CEPA against Lakewood; and (5) Count XX for hostile work environment under Section 1981 against DeSimone only.

<u>**ORDER**</u>

**THIS MATTER** having come before the Court on motions for summary judgment filed by Defendants Township of Lakewood, Gregory Meyer, Thomas Henshaw, and Robert Desimone (collectively, "Defendants"), (ECF Nos. 24, 26); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 9th day of December 2020,

**ORDERED** that Defendants' motion for summary judgment of **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment is **GRANTED** with respect to Counts IV, X, XIV, XV; and it is further

**ORDERED** that Counts I, II, V, VI, VIII, IX, XII, XVI-XIX, XXI-XXV are dismissed with prejudice; and it is further

**ORDERED** that Defendant Lakewood's motion for summary judgment is **DENIED** with respect to Counts III, VII, and XIII; and it is further

**ORDERED** that Defendant DeSimone's motion for summary judgment is **DENIED** with respect to Counts XI (for aiding and abetting a hostile work environment only) and XX; and it is further

**ORDERED** that Defendants Henshaw and Meyer's motion for summary judgment on Counts XI and XX is **GRANTED**.

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.